NEWCOMB, Administrator, &c. *v.* THE TRUSTEES OF ST. PE-
TERS CHURCH and others.

Where a church claiming two legacies, as to which the executors entertained doubt, received the same from the executors, and executed to them a bond and mortgage for the amount, payable in three years; but which were given solely for their indemnity: it was *held*, after the lapse of twenty-six years, that the residuary legatees could not enforce the mortgage, although the church was not entitled to receive the legacies so paid by the executors.

The mortgage created no trust or confidence between the church and the residuary legatees; and the presumption from lapse of time, that it was paid or satisfied; is conclusive.

A bequest to the free school of a church, the interest of which was to be appropriated by the trustees of the church for the use of the school forever, and if the school should not continue, then for the use of the church ; was held to be a valid legacy.

Where a testator bequeathed the dividends of twenty shares of bank stock, and it appeared that he had such shares at the date of his will and afterwards bought eighty shares more ; but sold the whole so that he had no such bank stock at his death ; the legacy was held to be adeemed.

R. by his will, gave two legacies to a church, one of which was valid, and the other being specific was adeemed. He gave all his residuary property to two sisters, who resided in Ireland and who never visited this country. The executors, without fraud or collusion, in 1812 paid both legacies to the church and took from the church a bond and mortgage for their indemnity. In 1817, M. one of the sisters, filed a bill here against the executors for an account ; and an account was taken by a master in 1822, pursuant to a decree. The payments to the church appeared in the executors accounts, and were allowed to them by the master. The master reported the sum due to B. the other sister, as well as to M., and the decree directed payment to them respectively ; although B. was not represented in the suit. It also directed the executors to sell the real estate whenever required by B. and M., and to pay them the proceeds. M. received the amount decreed to her. In 1832 B. and her husband filed a bill here against the surviving executor for an account ; which suit was continued by B.'s administrators ; and in which a decree for an account was made ; restricted to the basis of the account taken in M.'s suit in 1822. The master reported in B.'s suit, and in Feb. 1835 a decree was made in favor of her administrators, and also in favor of M.'s administrator, who had come in before the master. In 1835, B.'s administrators filed a bill to compel payment of the sum decreed to B. in M.'s suit in 1822 ; and the suit was settled on payment being made. In 1834, the heirs and legal representatives of B. and M. filed their bill against the surviving executor of R. praying the benefit of the decree in M.'s suit ; and that he might sell the real estate and carry that decree into effect ; and in 1836 a decree was made according to the prayer of the bill. During all these proceedings, the bond and mortgage of the church were unknown to B. and M., their representatives and legal advisers ; they were not produced or mentioned in the suits ; but they were not intentionally concealed or suppressed.

In a suit in 1842, by the administrators of B. and M., to have the benefit of the bond and mortgage ; or to compel the church, or R.'s surviving executor, to refund the legacies ; it was *held,* that the ignorance of M. and B. of the bond and mortgage was not material ; the executors being liable to account to them irrespective of those securities. That M. was barred by the accounting in 1822. And that B. by adopting it in the subsequent proceedings, was precluded from questioning its correctness. Also that B. was barred by her suit in 1832 and the decree thereon.

Where on an executor's accounting under a decree, he is allowed for a legacy improperly paid ; the adverse party cannot call the payment in question collaterally, or in another suit.

A legatee who goes in before the master, under a decree against an executor for an account obtained by another party, or who makes the result of such accounting

the basis of a suit or decree for an account in his own behalf; will be bound by the account taken in such first suit.

March 6, 7; August 8, 1845.

THE bill was filed on the 16th day of March, 1842, by William Newcomb as administrator with the will annexed of Mary Mathews, and by W. Newcomb and James McBride, as like administrators of Bridget O'Brien, against Cornelius Heeney as surviving executor of Mathew Reed, the Trustees of St. Peters Church in the city of New York, and James Kerrigan.

Mathew Reed who died in 1811, left a will dated in 1802, by which he appointed Andrew Morris, Charles McCarty and the defendant Heeney, his executors. He gave all his residuary property to his sisters, Mary Mathews and Bridget O'Brien, who resided in Ireland; one-third to the former, and two-thirds to the latter. Among other bequests was the following: " I bequeath to the parish clergy of St. Peters Church the dividend of twenty shares I hold in the Manhattan Company, or bank, and every dividend that is received by them to offer up four masses for the repose of mine and my father's, mother's, and relations souls, and I do appoint the trustees of St. Peters Church to receive said dividends or interest as it becomes due and pay it to said clergy or priests for the above purpose." And out of the residue of his personal estate he gave thus, " I bequeath to the free school of St. Peters Church the sum of two thousand dollars to be laid out in public stock, such as my executors will think most safe and beneficial, and the interest arising from said stock or shares to go and be appropriated by the trustees of said church to the use and support of said school forever, and in case the said school shall not continue, then the interest of said shares to go to the use and benefit of said church."

At the date of the will the testator owned twenty shares of Manhattan stock. He afterwards bought eighty shares more, and in January, 1809, sold the whole. He owned no stock in the company at his death. He was a pewholder and worshipper in St. Peters church, and there was a free school attached to the church at the time he made his will, and subsequently till long

after 1812. All the executors proved the will, but the management of the estate devolved principally on McCarty.

In July, 1812, the executors paid to one of the clergy of St. Peters Church, one year's interest on $1000 which sum was the par value of twenty shares of Manhattan Company stock. And on the 14th of September, 1812, they paid over to the trustees of that church $3000, being the amount of the legacy for the free school, and the value of the twenty shares of stock.

On the 20th of October, 1812, they took from the corporation of St. Peters, a bond and mortgage to them as executors, for the $3000, conditioned for its payment with interest on the 20th day of October, 1815.

The proof of the execution of these instruments as against the corporation, was objected to, and was much discussed at the hearing; but it became unimportant in the view taken of the case on its decision. The bond and mortgage were never recorded. They went into the possession of McCarty, and continued in his possession and that of his executors, till about the time of filing the bill in this cause.

Mary Mathews and Bridget O'Brien always resided in Ireland, and were never in this country. In 1817, Mary Mathews exhibited her bill in this court against Reed's executors for an account of his estate. Morris and Heeney answered the bill; but McCarty died before answering, and in 1821 the suit was revived against his executors, who put in an answer. On the 2d of April, 1822, a decree was made by the Chancellor directing a master to take the accounts. They were accordingly taken by Jeremiah I. Drake, one of the masters of the court, whose report is dated November 12th, 1822. By his report it appears that he allowed to the executors of Reed in their discharge, the payments to St. Peters Church, and they appear in his report in these words,

" 1812, July 23d, to check to Reverend Mr. Holkman for one year's interest of $1000 bequeathed to St. Peters Church, 70

Sept. 14, to check to church in full of legacy, 3000."

The master reported a sum due from the executors of Reed, and apportioned the same between Heeney, Morris, and McCarty's executors. He also reported how much of the same was due to Mathews, and how much to O'Brien.

The cause was brought to a hearing on the 29th of November, 1822, and a decree made, confirming the master's report, and directing payment to be made by the respective defendants to Mathews and O'Brien respectively. It also directed Reed's surviving executors to sell the real estate whenever requested by O'Brien and Mathews, and to divide and pay to them the proceeds according to Reed's will.

Mary Mathews received the sum awarded to her by this decree.

In January, 1832, Bridget O'Brien and her husband Terence, filed their bill in this court, against Heeney, who had then become the sole surviving executor of Reed, (in behalf of all the other legatees, &c., as well as themselves,) for an account of the estate of Reed, and especially of all which he had received or then held. T. O'Brien and his wife both died, pending this suit, and it was revived in favor of Newcomb and McBride, her administrators. In 1835, those administrators filed a bill in this court against Cooper as surviving executor of McCarty, to compel him to pay the sum decreed against McCarty's executors in favor of Bridget O'Brien in the suit of Mary Mathews by the final decree in 1822. This suit was settled by Cooper's paying to those administrators, upwards of $600.

The suit commenced against Heeney in 1832, came to a hearing, and a reference was made to a master to state an account, but the master was restricted by the order, to the basis and footing of the accounts stated by master Drake. An account was taken accordingly by Benjamin Clark, one of the masters, and a balance reported against Heeney, for which a final decree was made in February, 1835, in favor as well of the administrator of Mary Mathews who had come in before the master, as of O'Brien's administrators.

In 1834, the present complainants, with sundry heirs of Mathews and O'Brien, exhibited their bill in this court, against their co-heirs, and against Heeney as surviving executor of Reed, in which they set forth the proceedings and decree in Mary Mathews suit, and prayed the benefit of that decree, and that Heeney might sell the real estate of Reed, and that the decree might be carried into effect. In October, 1836, a decree was made in the suit commenced in 1834, directing the former decree to be carried

into effect, and the real estate to be sold and distributed accord-
ingly.

All these decrees were duly enrolled. In 1842, Newcomb ob-
tained the bond and mortgage executed by the church, and there-
upon this suit was commenced.

The bill charged that the payments to the church in 1812,
were unauthorized and illegal. That O'Brien and Mathews, and
their administrators, never knew or heard of the bond and mort-
gage till the latter heard of them in 1842. That their existence
was fraudulently concealed and suppressed on the accountings in
1822, and again in the suit of O'Brien's representatives ; and that
the corporation of the church had colluded with the executors.
That the bond and mortgage were taken for the benefit of the
residuary legatees, and were in trust for them, and enured to their
benefit. And that the complainants did not discover the alleged
frauds until 1842.

The bill required an answer on oath, and prayed for a foreclo-
sure of the bond and mortgage, or that the church might be de-
creed to refund the legacies and interest. It also prayed for a
decree against Heeney for the amount of each of the legacies and
interest. James Kerrigan was made a defendant as a subsequent
mortgagee of the premises ; but as he denied notice and none was
proved, his prior right was not contested.

In their answers, the corporation denied the bond and mort-
gage ; insisted upon the bar to them by lapse of time ; upon the
limitations prescribed by the revised statutes ; and upon the con-
firmation of the payment of the legacies, by the various chancery
suits and accountings before mentioned.

Heeney in his answer, pleaded the same bars to the complain-
ants demand. He stated that the bond and mortgage were de-
vised and executed after the legacies were paid, on a suggestion
that it might happen that the payments to the church might not
be approved of and confirmed by the legatees, and consequently
the executors might be made personally liable ; and the bond and
mortgage were given as a pledge for the faithful application of
the trust monies by the trustees, and as an indemnity to the exe-
cutors in case the legatees refused to confirm their acts.

Not having seen them since 1812, he says he had forgotten

their existence before the first accounting, and they did not occur to him until in 1841 or 1842, when called upon by Newcomb. He denied all the fraud charged and all collusion.

No interest had ever been paid on the bond and mortgage, and there had been no recognition of them on the part of the corporation, since they were executed.

The cause was brought to a hearing on the pleadings and proofs.

*H. S. Mackay* and *B. F. Butler*, for the complainants.

*C. O'Conor*, for the defendants.

The following points were made for the complainants.

1. The bond and mortgage made by St. Peters Church are ancient, and such as do not require to be proved, or proved strictly, although they are from the testimony fully established as the deeds of the defendant.

2. They were not taken, nor do they exist as ordinary outstanding securities for monies belonging to the estate of Mathew Reed, which the executors had the right to make their own, and for which they have at any time accounted in the usual way to the estate, but were peculiar and made for specific portions of that estate, set apart in provisional security for the benefit of the residuary legatees, to be made use of whenever being known to them, it should appear that the appropriation of the monies to the use of the church was not authorized by the will.

3. That hence the bond and mortgage, under the circumstances, stood and now stand in judgment of equity, as securities in the name of the executors for such monies, from which a trust resulted to and for the benefit of the legatees or their legal representatives.

4. That the bond and mortgage were concealed and kept from the knowledge of the legatees, from the time of making the same until in or about the month of February, 1842; when the same were first discovered by one of the present complainants; which amounted to a fraud in law and equity on the rights of the legatees and their legal representatives.

Newcomb v. St. Peters Church.

5. That by giving or advancing the monies to the church and taking back as countervailing securities, and for indemnity against such advance, the bond and mortgage, the payment to the church, (charged in the accounts of the executors referred to in Master Drake's report,) were not *absolute* but *contingent*, and continued to be dependent on the right of the executors to make such advances, which could only be tested when the bond and mortgage were known and the facts fully disclosed.

6. It hence became and is the right of the legatees or their representatives, to open the accounts or alleged payments, without regard to lapse of time ; as under the circumstances, neither the legatees or their representatives had any knowledge of the bond and mortgage or countervailing securities against such payments, out of which their rights arose, until a very recent period before filing this bill.

7. That the various suits and accountings, that have taken place in reference to the general assets and outstanding securities of the said estate, do not debar the complainants or affect their rights in the premises, as they all took place in their ignorance of the existence of the bond and mortgage for their benefit as countervailing securities, and while the same were fraudulently concealed by the defendants.

8. That no acquiescence of the complainants in the correctness of the advances made to the church is to be inferred, as besides the fraud, the legatees themselves were never in this country, and so far as they may be chargeable with implied notice, they were only bound to know what purports on the face of the account to have been an absolute, fair, outright and honest payment, by the executors to the church, according to the will ; and they could not know otherwise, until they were informed of the counter or explanatory securities existing in said bond and mortgage, which reserved and secured to them their rights.

9. That the fraudulent concealment of the bond and mortgage, is evinced by the executors refusing and neglecting to set forth the same, in any account exhibited by them of the estate, as good faith and honest dealing required them, when claiming the benefit of the payments or advances to the church, to state the countervailing securities which were concomitant and co-existent

with such payments or advances, or else to disclose the same among the general outstanding securities.

10. That if it be admitted that the bequest of $2000, to the free school was properly paid to the trustees of the church, yet at all events as to the sum of $1000, part of bond and mortgage, advanced to the church as an equivalent for the alleged specific legacy or bequest in the will of the dividends of twenty shares of the Manhattan Company, to the parish clergy of the church, the bond and mortgage still subsist as securities for that amount with interest, inasmuch as such bequest or legacy was adeemed, and had no existence in law or equity on the death of the testator, by reason that the bank shares were sold by the testator before his death. Nor were the executors authorized to substitute such payment in place or stead of the bank shares, or to pay the same in any manner, and hence on the execution of the bond and mortgage, the same enured for that amount at least, to the benefit of the sisters of the testator who were his residuary legatees, and whose representatives are now entitled to claim and demand the same.

11. That the defendants, the trustees of the church, ought to account for and refund the amount of $1000 with interest, by virtue of the bond and mortgage ; and in case of their default, the surviving executor Cornelius Heeney, ought to do so, on the ground that he has by his concealment of the bond and mortgage, and neglect to enforce the same against the church, assumed the responsibility thereof, and produced the loss of the same to the complainants to the extent above stated, together with the seventy dollars paid out of the funds of the estate to the Rev. Mr. Holkman, as interest on the $1000, with interest thereof.

12. The complainants therefore, claim a decree in this cause, that the bond and mortgage as to the $1000 and interest, be enforced against the church in the usual manner, or if not, or if the church should not pay the same, that the defendant Cornelius Heeney, be compelled to do so, together with the seventy dollars and interest, and the costs of this suit.

In behalf of the defendants, St. Peters Church, the following points were made.

I. The legacy to the school is clearly valid ; and the complainants are consequently entitled to no relief in respect thereof.

II. The legacy to the clergy being for pious uses, should be supported.

1. A gift of the profits is a gift of the thing.

2. Stock or its equivalent, ought to be purchased as a substitute, if the testator had no stock when he died.

III. If there was any mistake of law or fact, irregularity, or even fraud, in the payment of the $3000 to the church ; the parties in interest by long acquiescence, after full notice, ratified, and adopted the payment.

1. Ignorance that the executors had taken a mortgage security against their possible disaffirmance, in lieu of a refunding bond, would not prevent their approval of the payment, with notice of the terms of the will, operating as a ratification.

*a.* The nature of the gift, coupled with the fact of their coinciding religious opinions, favors the idea of a ratification.

*b.* The objections to the validity of the gift are technical, and *stricti juris.* They are not equitable, or to be favored ; and are such as, under the circumstances of this case, it is to be presumed the parties would waive.

IV. There is no sufficient evidence that the alleged mortgage produced in evidence, is the act and deed of these defendants.

1. No proof of seal.

2. No proof of delivery.

3. The trustees had no power to convey.

V. The alleged bond and mortgage, if ever sealed with the seal of the church, is invalid because given to persons whose presence was necessary to form a quorum of the trustees.

VI. The alleged bond and mortgage, not having been in any form acknowledged or recognized as a valid security for more than thirty years, is barred by lapse of time.

VII. The proceedings had in this court by the complainants, and set forth in the answer, form a perfect bar to all the relief sought by the bill in this cause.

VIII. The complainants having persisted in this harsh claim, in the face of full notice of its unfairness and illegality, they ought to be charged with costs.

THE ASSISTANT VICE-CHANCELLOR.—I will first consider the case as it is made out against St. Peters Church.

Without expressing any opinion as to the sufficiency of the proof of the execution of the bond and mortgage, or as to its being originally a valid corporate act ; I think there is an insuperable difficulty in the way of any decree against the church for its payment.

More than twenty-six years 'had elapsed after the bond and mortgage became due, before this suit was commenced. The mortgagees were all residents of this state ; and there is no evidence of any recognition whatever of the mortgage by the corporation or its officers during the whole of that period. The presumption that the mortgage was paid or satisfied, arising from the lapse of time, is conclusive, unless there is some circumstance in the case which takes it out of the general rule.(a)

The complainants rely upon two points as obviating the force of the rule; first, that there was a trust ; and second, that there was fraud. As to the trust, whatever there may have been in regard to the executors, there was none between the church and the legatees. The church claimed the two legacies, and so far as I can discover, claimed them in good faith. Whether they had any right to them or not, is a different question, and quite immaterial to the present inquiry. The executors paid them to the church, but having doubts as to the legality of the claim, took the bond and mortgage for their indemnity. If the payment turned out to be unauthorized, the executors would have been compelled to pay the amount to the testator's sisters, but the latter would have had no direct remedy against the church. The extent of their possible right to enforce the mortgage was this. If the executors had proved to be insolvent, so that the sisters could not collect the unauthorized payments from them, equity would have permitted them to enforce the bond and mortgage against the church ; either as a security held by their debtors which in such a case ought to enure to their benefit, or on the same principle that they might pursue a specific chattel of theirs, which could be identified, in the hands of a third person. But there was no trust or confidence, in regard to the transaction, existing between the church and those legatees.

(a) See *Campbell* v. *Graham*, 1 Russ. & Mylne, 453.

So as to the fraud. Much that I have said is applicable to this point. There is no trace of any collusion between the church and the executors, either in the payment of the two legacies, or in concealing from the residuary legatees the existence of the bond and mortgage. And unless there was bad faith in obtaining the payment, or a fraudulent collusion subsequently, I do not see how the charge of fraud against the church is to be sustained.

Aside from the bond and mortgage, the legatees have still less ground for exacting from the church, a return of the sums paid to the latter in 1812.

If there were any error in the payments, it was one of law as to the validity of the two legacies, so that the executors could not recover them back; much less could other legatees reclaim them in the absence of fraud or mistake of fact. And as to the residuary legatees, if the church had no other ground of defence against them, their acquiescence in the payments in the various proceedings in this court against the executors, constitutes an effectual bar to reclaiming such payments at this day.

The bill must therefore be dismissed as to St. Peters Church, and the defendant James Kerrigan.

SECOND. The claim made by the complainants against Heeney, the surviving executor of Reed.

As I have no doubt of the validity of the legacy of $2000 to the free school of St. Peters Church, this part of the investigation may be limited to the legacy of the dividends of twenty shares of Manhattan stock.

The twenty shares of stock were of the par value of $1000, but having been sold by the testator in his lifetime, the legacy was unquestionably adeemed.(a)

The executors nevertheless paid one year's interest to the church on the $1000, at the end of a year from the testator's death, and in less than two months after such payment, they paid the whole sum to the church, with the other legacy of $2000. The mortgage was not taken till more than a month after paying the legacies.

---

(a) See *Robinson* v. *Addison,* 2 Beavan, 515.

1. How does the case stand in reference to the administrator of Mary Mathews?

In 1817, she filed a bill in this court, against Reed's executors for an account, which she prosecuted to a final decree. The accounts of the executors were taken by a master in that suit, in 1822, when these transactions were comparatively fresh, and when the two residuary legatees were living, and competent to judge of the propriety of the payment of the legacy of $1000, under the circumstances, and Mary Mathews was competent to affirm it.

All the payments to the church were brought forward by the executors in that accounting, and were allowed by the master. They appear in his report so plainly and distinctly, that they could not have been overlooked or misunderstood by Mathews's agent, or her solicitor or counsel. The master's report shows how the word *check* came to be appended to nearly all the discharges credited to the executors, which was by reason of his using their bank book entire, for both charges and discharges. No exception was taken by Mathews to the report. On the contrary, she immediately obtained a decree upon it, and received the sum which was thereby awarded to her.

Her suit was founded on the will of Reed. She therefore knew of the gift of the Manhattan stock. The executors accounts before the master showed that they received no such stock, because there is no credit or statement for either the stock or its proceeds. The same accounts showed to her that they paid cash to the church, both interest and principal, and that they had not either paid dividends on the stock or transferred the stock itself.

Mary Mathews, (or those acting for her, which is the same thing,) knowing all these matters, either opposed the allowance of the payments, or assented to their propriety.

If she contested them, the decision of the master concluded her. It is more probable, and more creditable to her to believe, that she cheerfully acquiesced in the payment by which her brother's pious provision for masses for the repose of his soul and those of his relatives, was carried into effect. To her, if educated in the same faith, this doubtless appeared to be a holy and most sacred object, although to others it may seem superstitious.

Newcomb v. St. Peters Church.

On every hand, it therefore appears that she was concluded by the accounting in 1822.

The complainants attempt to avoid this conclusion, by showing that the confirmation of the payment of the legacy was made in ignorance of the existence of the bond and mortgage; and that their existence was fraudulently concealed from the residuary legatees, by the executors.

Heeney's answer shows that the bond and mortgage were not produced before the master on the accounting. But there is no fraudulent suppression or concealment of them established. The answer of Heeney, which is responsive to the strong charges in the bill on this subject, as well as to the interrogatory thereon, is proof in his favor that there was no fraud or suppression, and that he had forgotten the existence of those securities.

It thus appears that they were not produced, but that the omission was not intentional. The executor who had originally taken and retained them, was at that time dead; and there is no proof of any suppression or concealment on the part of the other executor, Morris.

I think it should be assumed that the residuary legatees, were ignorant of the existence of the bond and mortgage.

The sole question as to Mary Mathews, is thus reduced to this point; does her ignorance of that fact, impair or destroy the effect of the allowance of the payments to the executors, by the master on the accounting?

If she contested the allowance, her ignorance was perfectly immaterial, because the bond and mortgage would not have made the payment any more or any less valid. I have supposed it probable that she did not contest it. If I were to act on that probability, instead of proof, it is based on her regard for her brother's wishes, and upon her supposed religious views and belief. In respect of these also, the bond and mortgage could have had no influence.

It was urged that she may have confirmed the payments, because she supposed their disallowance would work a total loss of the amount to the executors, or subject her to a quarrel with her mother church. I cannot give any heed to the suggestion that the idea of a loss to the executors influenced Mathews or her

agent in the slightest degree ; for the master's report contains many charges made against them *strictissimi juris*, and shows that the accounting was rigid and unrelenting on the part of the complainant.  As to the other suggestion, fear of the church, it certainly would have been quite as cogent a motive if she had known all about the bond and mortgage.  An attempt to reclaim the money thus devoted and used for masses for her dead kindred, would have been as sacrilegious and as likely to lead to anathema, if it were made through these securities by Mary Mathews, as if it were pressed through a suit against the executors.

In my judgment, the existence of the bond and mortgage was in no wise material to be made known to her, and the accounting is equally conclusive as if she had known all the facts connected with them.

The will, the payments and their time and manner, their legal effect, and the fact that there was no Manhattan stock, are to be taken as fully within her knowledge.  Her remedy was a plain one ; it was against the executors, and it is not disputed that they were able to respond to it.  Whether they were ultimately to lose the amount paid, or had indemnity for it, was a matter of entire indifference to her and to her rights.

The answer of Heeney proves that the bond and mortgage were a subsequent act ; and were in truth for the sole indemnity of the executors, embracing both the valid legacy, and the one which was adeemed.  To the executors, they were equivalent to the bond which the statute then prescribed to be given by legatees on receiving payment, (1 Rev. Laws, 314, § 18.)  They *were not an investment, and the executors could not have* turned them over as such to either of the legatees, without her consent.

The fact that these executors had taken such indemnity, could not in any degree influence the legal conclusion of the master or of the complainants, in regard to allowing them for the payment of the legacy of $1000.  And if I am to speculate on the motives, which aside from an erroneous conclusion as to the validity of the legacy, influenced its allowance, I find they are motives that would not have been affected by a knowledge of the bond and mortgage.

I must therefore, hold that Mary Mathews was barred by the accounting before the master. I have not considered whether the effect would have been otherwise, in case a knowledge of the bond and mortgage had been important to her allowance of the payments.

2. The administrators of Bridget O'Brien present a different case in some particulars, from that of Mary Mathews.

Provision was made for her in the decree in Mathews's suit, and the accounting before the master embraced not only the whole estate to that time, but also the separate payments made to the residuary legatees.

There is no evidence however, that she was a party to that suit; by going in before the master or otherwise; and the accounting and decree would not of themselves affect her rights. But it appears that she subsequently filed a bill founded upon the decree, to recover of the executors of McCarty the sum thereby directed to be paid by them to her; and she received such sum or a part of it, from them in consequence of that proceeding.

It is in vain to say that it does not appear that she knew of any thing more than the decree. The law charges her with notice of all the proceedings in the suit which led to the decree, so far as they were on record and affected her rights; and she could not shut her eyes to the contents of the executors accounts, while she availed herself of the balance found and reported by the master, and decreed by the court.

I think that her representatives are precluded by these circumstances, from going back of the accounting in the suit of Mathews.

It is indifferent to this conclusion, whether Bridget O'Brien was a feme covert or not in 1822. If she were, the legacy was recoverable by her husband, and his suit for it would bind her, so far as this question is concerned.

Another and a conclusive bar to her administrators, is found in the decrees and other proceedings in the suit instituted by Terence O'Brien and his wife in 1832, and revived by her administrators. That was a bill for a general account of the administration of Reed's estate. The decretal order in that suit directing a master to take the accounts, is limited to the time subsequent to

the Mathews decree, and adopts the result in the Mathews accounting, as its basis for the previous period; and the same ground was taken by Heeney before the master, and was adopted by him. The decrees in the O'Brien case, decide that the accounting in 1822 is binding upon Mrs. O'Brien's representatives, as well as upon those of Mathews. They are a judicial determination of the point, which is not to be drawn in question in this court.

The silence of Heeney on this reference in regard to the bond and mortgage, is alleged to be fraudulent. There is the same answer to the fraudulent intent as was given before. But there was less reason for his remembering the securities on this occasion, than there was on the reference before Master Drake, thirteen years before. The legacies to the church were allowed in 1822, and the account closed. They were not in controversy in 1835, and could not be controverted under the decretal order in the suit of O'Brien's.

On whatever ground the court proceeded in 1835, in holding the former accounting binding upon the O'Brien's, the decision cannot now be disturbed.

If it be said that the force of the decrees in the suit of O'Brien's administrators ought to be in any manner influenced by her and their ignorance of the bond and mortgage; the considerations which I have already mentioned in reference to Mary Mathews, are applicable to this argument in behalf of Mrs. O'Brien.

The bill must be dismissed as to the defendant Heeney.

The question of costs is not without its difficulty. I think upon the whole, that the suit is not wantonly brought against either of the defendants, and the bill will be dismissed without costs.